UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| AT&T MANAGEMENT SERVICES, L.P., AT&T SERVICES, INC., and AT&T MOBILITY, LLC, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:15-CV-0073-B |
| CRI CONSULTANTS LIMITED, | § § § | |
| Defendant. | § | |

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendant CRI Consultants Limited's Motion to Stay or Dismiss Plaintiffs' Suit. Doc. 5. For the reasons that follow, the Court **GRANTS** the Motion and **STAYS** these proceedings.

I.

BACKGROUND

A.    *Factual Background*

In this case, Plaintiffs AT&T Management Services, L.P., AT&T Services, Inc., and AT&T Mobility LLC (collectively, "AT&T") seek a declaratory judgment of non-liability against Defendant CRI Consultants Limited ("CRI") regarding their contractual disputes. In response, CRI moves the Court to exercise its discretion to stay or dismiss this action because it was filed while CRI was in the process of bringing suit against AT&T in England on the same underlying issues.

In its Original Petition seeking declaratory judgment, AT&T characterizes the facts shaping

- 1 -

the parties' dispute in the following way. Plaintiff AT&T is a U.S. telecommunications company headquartered in Dallas, Texas. Doc. 1-1, Notice of Removal, Ex. 1, Orig. Pet. ("Orig. Pet.") ¶ 9. AT&T conducts business worldwide, which frequently requires its employees to travel internationally. *Id.* As a result, AT&T's Flight Operations and Asset Protection departments frequently coordinate with third-party vendors to provide security and support services for AT&T's aircraft and employees while they travel abroad. *Id.* One such provider of security services is Defendant CRI, which is located in London, United Kingdom. *Id.* at ¶ 10. Starting in May 2011, AT&T's Flight Operations and Asset Protection departments began using CRI to provide certain security services for AT&T's corporate jets and employees traveling internationally. *Id.* AT&T notes that CRI's services typically included Jet Support Teams, which monitor and secure AT&T's jets when they are on the tarmac in foreign countries. *Id.* CRI also provided surveillance and ensured the safety of AT&T's assets during travel. *Id.*

 1. The Dallas Training Session

 According to AT&T, in the summer of 2012, AT&T's Flight Operations and Asset Protection departments began discussing with CRI the possibility of providing a security training session for AT&T's flight crews and personnel based in Dallas, Texas. *Id.* at ¶ 11. The vision for this training session (the "Dallas Training Session") was to bring awareness and knowledge to AT&T's Dallas-based flight crews regarding the importance of jet security and employee protection and to inform them of the measures AT&T takes to provide such security on international trips. *Id.*

 AT&T avers that, while the Dallas Training Session was first discussed with CRI in May of 2012, coordination and planning for the session did not begin until December 2012. *Id.* at ¶ 12. AT&T maintains that CRI's preparation efforts for the Dallas Training Session were coordinated

with AT&T's Flight Operations and Asset Protection personnel and were limited to the preparation of basic informational materials, including a presentation by CRI's president, Darrell Crawford-Smith. *Id.*

The Dallas Training Session was held in January 2013 over the course of two days. *Id.* at ¶ 13. Crawford-Smith was allegedly the only CRI employee who traveled to Texas for this event. *Id.* According to AT&T, CRI did not request payment for the Dallas Training Session at the time, and it had allegedly expressly agreed that Crawford-Smith's participation in the session was free of charge, done as a courtesy to AT&T. *Id.* at ¶ 14. Part of the dispute between AT&T and CRI is centered on what was included in the agreement regarding the Dallas Training Session and whether such agreement provided for payment to CRI.

2.    The Tokyo Trip

Another aspect of the parties' dispute involves compensation for the services CRI allegedly provided during AT&T personnel's trip to Tokyo, Japan (the "Tokyo Trip"). In early April 2013, an AT&T jet departed Dallas with stops planned in London, Tel Aviv, and Tokyo. *Id.* at ¶ 15. CRI provided a Jet Support Team for the London and Tel Aviv portions of the trip. *Id.* AT&T contends that these services were carried out "as requested and confirmed by email communications from AT&T Flight Operations," although AT&T's pleadings do not specify when and how the parties agreed to the provision of these services. *Id.* During this same time period, AT&T's Asset Protection department began investigating CRI's Jet Support Team, employee protection program, as well as its policies and procedures. *Id.* at ¶ 16. AT&T explains that, given the importance of the security services provided by CRI, its confidence in and ability to trust CRI in the provision of those services was of paramount importance. *Id.* After concluding its investigation of CRI, AT&T's Asset

Protection department allegedly determined that AT&T would no longer require CRI's security services. *Id.*

According to AT&T, on April 11, 2013, shortly after the AT&T jet departed Tel Aviv but allegedly before AT&T Asset Protection finalized any plans for CRI to provide a Jet Support Team for the Tokyo Trip, AT&T informed CRI that it would no longer require its services. *Id.* at ¶ 17. Within half an hour of receiving this notice from AT&T—and allegedly prior to any CRI personnel boarding a flight to Tokyo—Crawford-Smith of CRI acknowledged receipt of AT&T's email notification that CRI's services were no longer required and that it would not be necessary for CRI to travel to Tokyo. *Id.*

Nevertheless, on July 8, 2013, CRI sent an invoice to AT&T for the Tokyo Trip in the sum of $43,392; of this amount, $31,800 was assigned to expenses for services provided on the trip, while the remaining expenses were related to flights, hotels, meals, communication, and other items. *Id.* at ¶ 18. AT&T maintains that it has no obligation to pay any portion of CRI's invoice for the Tokyo Trip, but it explains that it nevertheless reimbursed CRI $10,092 for flight and hotel expenses incurred prior to AT&T informing CRI that its services on the Tokyo Trip were not required. *Id.* at ¶ 19.

3.    The Demand Letters

AT&T acknowledges that on March 19, 2014, CRI sent a demand letter to AT&T seeking payment of CRI's invoiced amount of $31,800 for its Jet Support Team services. *Id.* at ¶ 20. According to AT&T, CRI never provided these services on the Tokyo Trip. *Id.* CRI's demand letter also sought payment of an additional £350,000 (in excess of $500,000) for the Dallas Training Session. *Id.* AT&T avers that CRI's March 19, 2014 demand letter was the first notification it

received of CRI's request for payment for the Dallas Training Session. *Id.*

On April 24, 2014, AT&T received a second demand letter from CRI seeking payment of the same amounts listed in the first letter. *Id.* at ¶ 21. Over seven months later, on December 10, 2014, CRI sent a third demand letter to AT&T. *Id.* at ¶ 22. CRI's third demand letter sought payment of CRI's entire July 8, 2013 invoice for the Tokyo Trip and, again, a £350,000 payment for the Dallas Training Session. *Id.* As AT&T acknowledges, this demand letter stated that AT&T had agreed to pay CRI travel and accommodation costs and had agreed to continue to retain CRI as its preferred security and asset protection provider for the following two years or, alternatively, if the relationship was to end, AT&T would pay CRI £350,000 for the Dallas Training Session. *Id.* AT&T's alleged agreement with CRI regarding the Dallas Training Session was purportedly made orally between Crawford-Smith of CRI and Derek Mendonça, an AT&T employee at the time who was subsequently terminated in February 2013.[1] *Id.* at ¶ 23. AT&T objects to the statements made in this demand letter, insisting that there is no valid agreement to compensate CRI for the Dallas Training Session. *Id.*

Based on these alleged events, AT&T brought this suit in Dallas County Court, seeking a declaration of its rights regarding the purported contracts with CRI relating to the Dallas Training Session and the Tokyo Trip. *Id.* at ¶ 26. AT&T insists that it never entered into an agreement with CRI pursuant to which AT&T would retain CRI for any specified period of time or pay CRI any amount for the Dallas Training Session. *Id.* at ¶ 27. In addition, AT&T argues that, even if

---

[1] While AT&T's Original Petition lists Mendonça's termination date as February 2014, its Response to Defendant's Motion to Stay or Dismiss (doc. 10) and its accompanying affidavits indicate that Mendonça was in fact terminated in February 2013. *See* doc. 11, App. in Support of Response to Defendant's Motion to Stay or Dismiss, Akin Decl., App. 23, ¶ 7.

Mendonça had attempted to make such an agreement with CRI, he lacked the authority to act on behalf of AT&T. *Id.*

### 4.  CRI's Allegations

In bringing the present Motion to Stay or Dismiss, CRI disputes many of the facts alleged by AT&T and further emphasizes the importance of others. Although the Court need not resolve factual disputes at this early stage of the litigation, some of CRI's contentions relate to the factors the Court must consider in deciding the Motion, and thus bear noting. Most significantly, CRI insists that "[d]uring most of the parties' business relationship, CRI's main contact at AT&T was Derek Mendonça," who CRI describes as "an Englishman based in AT&T's London office who served as its Asset Protection Director and Head of International Investigations from 1997 until February 2013." Doc. 5, CRI Mot. to Stay or Dismiss ("CRI Mot.") 1. According to CRI, Mendonça negotiated several contracts for CRI's services on behalf of AT&T. *Id.* CRI indicates that these contracts were "[m]ade in England by English personnel," and thus "were governed by English law." *Id.* Unsurprisingly, CRI maintains that Mendonça, acting on behalf of AT&T, entered into two valid oral agreements with CRI's Crawford-Smith. Under the first agreement, CRI would undertake the Dallas Training Session in exchange for (i) AT&T's paying CRI's travel and accommodation costs and (ii) AT&T's either paying CRI a fee of £350,000 or continuing to retain CRI as its preferred security and asset protection provider for the following two years. *Id.* at 2. CRI contends that it spent several months in England designing a special program for the Dallas Training Session. *Id.*

CRI also avers that the Tokyo Trip was in fact governed by an oral contract which the parties formed in February 2013—prior to the April 2013 commencement of AT&T's Dallas–London–Tel Aviv–Tokyo trip. *Id.* at 3; *see* Orig. Pet. ¶ 15. Again, CRI notes that the contract was entered into

by Crawford-Smith on behalf of CRI and Mendonça on behalf of AT&T. CRI Mot. 3. CRI allegedly agreed to undertake the project on a "per man per day" basis. *Id.* CRI maintains that it provided security services, as agreed, on the first leg of the trip between London and Tel Aviv. *Id.* CRI agrees that AT&T terminated the parties' relationship before the next portion of the trip to Tokyo, but it argues that AT&T refused to pay the balance owed on this contract. *Id.*

With respect to the demand letters—which AT&T acknowledges it received—CRI indicates that, upon receiving the second letter in April 2014, AT&T requested that CRI comply with English "Pre-Action Protocol," which, according to CRI, "requires a detailed letter stating the legal claim before suit." *Id.* at 3–4. Thus, in a letter dated May 13, 2014, AT&T's then-counsel in England allegedly asked that CRI "provide a Protocol compliant letter before claim to which our client [AT&T] may respond in line with the timescales set out in the [English Pre-Action] Protocol." *Id.* at 4; doc. 15, CRI Am. App. in Support of Mot. to Stay or Dismiss ("CRI Am. App."), AT&T's Letter Requesting English Pre-Action Protocol, App. 7. CRI notes that it complied with AT&T's request by sending such a letter on December 10, 2014—a letter AT&T acknowledges receiving. CRI Mot. 4; CRI Am. App., CRI's Pre-Action Protocol Letter, App. 9–33; *see* Orig. Pet. ¶ 22. However, according to CRI, AT&T did not send the promised response within the stipulated time frame, but instead filed the present declaratory judgment action in Dallas on December 15, 2014, with "full knowledge of CRI's imminent suit in England." CRI Mot. 4. Shortly after AT&T initiated this action, CRI filed suit in English court in accordance with English protocol—a fact that AT&T does not dispute. *Id.*

B.      *Procedural Background*

AT&T originally brought this action for declaratory judgment pursuant to the Texas

Declaratory Judgment Act, Tex. Civ. Prac. & Rem. Code § 37.004, in the 116th Judicial District Court of Dallas Country, Texas on December 15, 2014.[2] *See* Orig. Pet. ¶ 25. CRI promptly removed the action to this Court on January 9, 2015. Doc. 1, Notice of Removal 1. CRI subsequently filed the present Motion to Stay or Dismiss Plaintiffs' Suit (doc. 5) on January 22, 2015, urging the Court to stay or dismiss AT&T declaratory action in light of the related lawsuit pending in England. AT&T filed its Response to the Motion (doc. 10) on February 12, 2015, to which CRI replied (doc. 13) on February 26, 2015. As such, the Motion is ripe for the Court's review.

## II.

## LEGAL STANDARD

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The "district courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). As the Supreme Court explained in *Wilton*:

> There is nothing automatic or obligatory about the assumption of 'jurisdiction' by a federal court to hear a declaratory judgment action. . . . Consistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound

---

[2] The Fifth Circuit has consistently interpreted the Texas Declaratory Judgments Act as a procedural statute that is inapplicable to declaratory judgment actions in federal court. *See Camacho v. Tex. Workforce Comm'n*, 445 F.3d 407, 409 (5th Cir. 2006); *Utica Lloyd's of Tex. v. Mitchell*, 138 F.3d 208, 210 (5th Cir. 1998). As such, federal courts apply federal procedural rules. *Rhodes v. Prince*, No. 3:05-CV-2343-D, 2006 WL 954023, at *4 (N.D. Tex. Apr. 11, 2006) *aff'd sub nom. Rhodes v. City of Arlington*, 215 F. App'x 329 (5th Cir. 2007). In this matter, therefore, the Court must consider AT&T's request for declaratory judgment under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201. *Id.*

> exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment before trial . . . . In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration.

*Id.* at 288 (internal citations, quotations, and alterations omitted); *see also Rowan Cos., Inc. v. Griffin*, 876 F.2d 26, 28 (5th Cir. 1989) ("It is well established that a district court is not required to provide declaratory judgment relief, and it is a matter for the district court's sound discretion whether to decide a declaratory judgment action.") (quotation omitted).

In considering whether to decide or dismiss a declaratory judgment suit, a "federal district court must determine: (1) whether the declaratory action is justiciable; (2) whether the court has the authority to grant declaratory relief; and (3) whether to exercise its discretion to decide or dismiss the action." *Sherwin-Williams Co. v. Holmes Cnty.*, 343 F.3d 383, 387 (5th Cir. 2003) (citation omitted). "However, though the district court's discretion is broad, it is not unfettered." *Travelers Ins. Co. v. La. Farm Bureau Fed'n, Inc.*, 996 F.2d 774, 778 (5th Cir. 1993).

## III.

## ANALYSIS

AT&T brings this declaratory judgment action seeking a declaration that it is not liable to CRI on the putative contracts governing the Dallas Training Session and the Tokyo Trip. Orig. Pet. ¶¶ 26–28. Specifically, AT&T argues that (1) CRI agreed to conduct the Dallas Training Session free of charge; (2) even if Mendonça attempted to enter into a contract providing for CRI's compensation for the Dallas Training Session, he lacked the authority to bind AT&T to such a contract; and (3) AT&T has no obligation to compensate CRI for the Tokyo Trip, as CRI was terminated before it could provide services for this trip. *Id.* CRI, in turn, requests that the Court

exercise its discretion to stay or dismiss this action, insisting that it was filed in anticipation of CRI's own lawsuit filed against AT&T in England on the same underlying issues. CRI Mot. 4. AT&T responds that the Court should exercise its discretion to decide, rather than dismiss, this declaratory action. Doc. 10, AT&T Resp. 9–10.

As noted above, when considering whether to decide or dismiss a declaratory judgment action, a "federal district court must determine: (1) whether the declaratory action is justiciable; (2) whether the court has the authority to grant declaratory relief; and (3) whether to exercise its discretion to decide or dismiss the action." *Sherwin-Williams Co.*, 343 F.3d at 387.

The parties do not contest the first two elements of this inquiry—that AT&T's declaratory judgment action is justiciable and that this Court has the authority to grant such declaratory relief. Orig. Pet. ¶ 29; AT&T Resp. 9; doc. 4, CRI Answer ¶ 29; CRI Mot. 5–9. First, AT&T alleges, in its pleadings, that "[a] justiciable controversy exists as to AT&T's alleged agreement to pay CRI £350,000 for Crawford-Smith's participation in the two-day Dallas Training Session" because "Crawford-Smith agreed to participate in the Dallas Training Session free of charge." Orig. Pet. ¶ 29. AT&T makes a similarly styled argument with respect to the second contract in question. *Id.* In its answer to these pleadings, CRI admits the justiciability of these controversies. CRI Answer ¶ 29. Therefore, the Court assumes, without deciding, that this declaratory judgment action is ripe and presents "a case of actual controversy." 28 U.S.C. § 2201; *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 896 (5th Cir. 2000) ("A declaratory judgment action is ripe for adjudication only where an 'actual controversy' exists."). Turning to the second step of the relevant inquiry, the parties do not challenge the Court's "authority to grant [the requested] declaratory relief." *Sherwin-Williams Co.*,

343 F.3d at 387. Accordingly, the Court again assumes, without deciding, that it does have authority to grant the declaratory relief requested on this contractual dispute.

It is with respect to the third element of the inquiry that AT&T and CRI strongly disagree—whether the Court should exercise its discretion to decide or dismiss this action. *Id.* CRI urges the Court to abstain from deciding this declaratory action, requesting that the suit be stayed or dismissed in light of the pending English lawsuit on the same underlying issues. CRI Mot. 5. AT&T objects to such a stay or dismissal, and instead asks that the Court retain the case and decide it on the merits. *See* AT&T Resp. 9–10.

In exercising their discretion over whether to decide or dismiss a declaratory action, courts in the Fifth Circuit consider the following seven factors:

> (1) whether there is a pending state action in which all of the matters in controversy may be fully litigated;
> (2) whether the plaintiff filed suit in anticipation of a lawsuit filed by the defendant;
> (3) whether the plaintiff engaged in forum shopping in bringing the suit;
> (4) whether possible inequities in allowing the declaratory plaintiff to gain precedence in time or to change forums exist;
> (5) whether the federal court is a convenient forum for the parties and witnesses;
> (6) whether retaining the lawsuit would serve the purposes of judicial economy; and
> (7) whether the federal court is being called on to construe a state judicial decree involving the same parties and entered by the court before whom the parallel state suit between the same parties is pending.

*Sherwin-Williams Co.*, 343 F.3d at 388 (citing *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590–91 (5th Cir. 1994)).

CRI insists that these factors favor dismissal, arguing that AT&T filed the present lawsuit in anticipation of the English lawsuit and engaged in forum shopping. *See* CRI Mot. 5–17. CRI adds that England is the more convenient forum, where litigating this matter would reduce possible inequities and promote judicial economy. *Id.* AT&T disagrees on each of these issue and argues that

the seven factors—or *Trejo* factors— counsel toward deciding this case. *See* AT&T Resp. 9–10. For the reasons detailed below, the Court determines that the seven factors weigh in favor of abstaining from deciding this declaratory suit and staying the proceedings.

A.    *Pending State Action*

The Court first considers whether there is a pending state action in which all of the matters in controversy may be fully litigated. *Sherwin-Williams Co.*, 343 F.3d at 388. CRI requests the stay or dismissal of the present declaratory action, noting that the English court, where the related case is pending, is an available alternative forum where the dispute can be resolved and where the parties will be treated fairly. CRI Mot. 9. In response, AT&T does not challenge the suitability of the English forum, but rather insists that this first factor weighs against dismissing the case because there is no pending *state* action where the matters can be litigated. AT&T Resp. 10. In support, AT&T points to *Sherwin-Williams Co.*, in which the Fifth Circuit indicated that this factor is aimed at determining the "proper allocation of decision-making between state and federal courts." *Sherwin-Williams Co.*, 343 F.3d at 390; AT&T Resp. 10.

In its Reply, CRI concedes that this inquiry most commonly arises in the context of parallel proceedings in state and federal courts, but it argues that the considerations underlying this inquiry—such as whether the claims of all parties can be adjudicated in the other parallel proceeding, and whether necessary parties have been joined and are amenable to suit—apply equally to foreign actions. Doc. 13, CRI Reply 5; *see Wilton*, 515 U.S. at 283 (quotations omitted).

The Court agrees with CRI that the pendency of a foreign, rather than state, action does not weigh against staying or dismissing the present declaratory lawsuit. While most cases discussing the need for abstention from a declaratory action indeed occur in situations where there is another

pending state action, courts have, in many instances, applied this analysis to disputes centered in foreign courts. For example, in *Pacific Employers Insurance Co. v. M/V Capt. W.D. Cargill*, the Fifth Circuit affirmed the dismissal of a declaratory action that involved "the very issue [plaintiff] was to be sued on by the [counterparty] in a Belgian court." 751 F.2d 801, 803–05 (5th Cir. 1995); *see also Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359–60 (2d Cir. 2003) (affirming the dismissal of a declaratory suit related to a defamation suit pending in the United Kingdom and noting that an important factor was "whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court."). AT&T presents no authority suggesting that the existence of a pending foreign, rather that state, suit weighs against abstention, nor is there any indication that such authority exists.

Therefore, the fact that the case related to the declaratory action is in a foreign court and not in a U.S. state court does not alter the inquiry into whether there is a pending action in which the dispute may be fully litigated. Here, such a pending action exists in an English court. The parties do not dispute that the present declaratory action and the English lawsuit involve the same underlying issues and parties, nor does AT&T question CRI's insistence that England is a forum where the issues can be litigated fairly. CRI Mot. 9–11; AT&T Resp. 9–10. Indeed, there is no reason to suspect that the parties will "be deprived of all remedies or treated unfairly" in English court. *See DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 796 (5th Cir. 2007) (citation omitted) (affirming dismissal of action on grounds of *forum non conveniens*, explaining that "[a] foreign forum is adequate when the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy . . . all the benefits of an American court," and concluding that Mexico is an adequate forum); *Syndicate*

*420 at Lloyd's London v. Early Am. Ins. Co.*, 796 F.2d 821, 830 (5th Cir. 1986) (concluding that the English forum is "both available and adequate").

Based on the foregoing, the Court determines that the first factor weighs heavily in favor of staying or dismissing this action in light of the substantially similar lawsuit pending in English court.

B.      *Anticipatory Lawsuit*

The Court next examines whether the plaintiff, AT&T, filed this suit in anticipation of another lawsuit filed by the defendant, CRI. *Sherwin-Williams Co.*, 343 F.3d at 388. CRI argues that AT&T filed this declaratory action after receiving three demand letters from CRI's English counsel and after requesting that CRI comply with the English Pre-Action Protocol. CRI Mot. 11. CRI further maintains that AT&T stated it would respond to CRI's Protocol letter before it filed its own lawsuit in Texas. *Id.* at 12. In response, AT&T simply insists that it was not *impermissible* for it to initiate this action in anticipation of CRI's imminent lawsuit in England. AT&T Resp. 11–12. AT&T confirms that it received three demand letters from CRI and explains that it subsequently filed the present suit because it did not wish to "wait to see if CRI would make good on its latest threat" to bring a lawsuit in England. *Id.* at 12.

Indeed, the "mere fact that a declaratory judgment action is brought in anticipation of other suits does not require dismissal of the declaratory judgment action." *Sherwin-Williams Co.*, 343 F.3d at 397. However, a plaintiff's initiation of a declaratory action in anticipation of the defendant's filing of another lawsuit remains a factor that the Court must consider when deciding whether to exercise its discretion to decide the case. *See id.* at 388; *Trejo*, 39 F.3d at 590–91. Here, CRI does not contest the fact that it filed this suit in anticipation of CRI's lawsuit in England. *See* AT&T Resp. 11–13. The parties' interactions leading up to the filing of this declaratory action further indicate that

AT&T filed the suit upon being made aware of the imminence of CRI's lawsuit in English court. While there may be nothing impermissible about AT&T's declaratory action, it remains anticipatory, and the Court must account for the anticipatory nature of this suit when deciding whether to abstain from hearing it on the merits. Accordingly, the Court determines that the second factor weighs in favor of staying or dismissing this action. *See, e.g., Amerada Petroleum Corp. v. Marshall*, 381 F.2d 661, 663 (5th Cir. 1967) (affirming dismissal of declaratory action where plaintiff filed the suit "as the immediate result of the [defendant's] letter inviting it to appear [in another court]."); *Granite State Ins. Co. v. Tandy Corp.*, 986 F.2d 94, 96 (5th Cir. 1992) (affirming stay of declaratory action in part because it was filed in anticipation of the defendant's suit and noting that the parties "engaged in lengthy negotiations" over the declaratory defendant's claims and the defendant's own lawsuit "followed within weeks" of the declaratory suit).

C.    *Forum Shopping*

Next, the Court turns to the third factor, which inquires whether the plaintiff engaged in forum shopping in bringing this declaratory action. *Sherwin-Williams Co.*, 343 F.3d at 388. CRI argues that AT&T forum shopped in bringing this suit because litigating the matter in Texas rather than in England gives it the following advantages: (1) familiar setting and local jury pool; (2) a more favorable law than England's "loser pays" rule; and (3) inconvenience and expense to CRI. CRI Mot. 13. Again, AT&T insists that it was not engaged in impermissible forum shopping, as it brought the suit in Texas simply because Texas is the proper forum for this litigation. AT&T Resp. 13. In response to the avoidance of England's "loser pays" rule, AT&T notes that a similar statutory basis for recovery of attorney's fees and costs is available to a prevailing party on a breach of contract claim in Texas. *Id.* at 14 (citing Tex. Civ. Prac. & Rem. Code § 38.001). In reply, CRI argues that the

Texas rule differs from England's "loser pays" standard, particularly with respect to the "reasonableness" of fees and the definition of a "prevailing party." CRI Reply 7.

Although "the filing of every lawsuit requires forum selection," the inquiry here is simply "whether the plaintiff engaged in forum shopping in bringing the suit." *Sherwin-Williams Co.*, 343 F.3d at 388, 391; *Trejo*, 39 F.3d at 591. In this case, AT&T's anticipatory lawsuit in Dallas indeed reveals forum shopping. The parties agree that CRI sent its initial demand letters to AT&T's then-counsel in England. *See* AT&T Orig. Pet., Ex. 4, CRI's Demand Letter (addressed to Eversheds, LLP, located in Leeds, United Kingdom); CRI Mot. 3. And, as CRI indicates—to no objection from AT&T—AT&T's then-counsel in England requested that CRI comply with English Pre-Action Protocol by providing a letter, prior to filing its claim, "to which [AT&T] may respond in line with the timescales set out in the Protocol." CRI Mot. 4; CRI Am. App., AT&T's Letter Requesting English Pre-Action Protocol, App. 7; *see also* AT&T Resp. 8 n.34 (referring to its May 13, 2014 letter to CRI requesting compliance with English Pre-Action Protocol). After AT&T received this additional demand letter dated December 10, 2014, it did not respond to it as it had indicated it would in its May 13, 2014 letter; instead, on December 15, 2014—merely five days after receiving CRI's Protocol-compliant letter—AT&T filed the present declaratory judgment action in Dallas. AT&T Orig. Pet. 6; AT&T Resp. 8. The dynamics of the parties' relationship in England suggest that AT&T filed this action in Dallas to curb any advantages CRI may have had in being the first to bring its lawsuit in England after attempting to comply with the English Pre-Action Protocol.

The issue of attorney's fees further supports the conclusion that AT&T engaged in forum shopping. While the Texas Civil Practice and Remedies Code offers attorney's fees to the prevailing party in a breach of contract case, such an award is subject to certain contingencies, as the Texas rule

- 16 -

requires the fee to be "reasonable" based on several factors. Tex. Civ. Prac. & Rem. Code § 38.001(8); *Sharif v. Wellness Int'l Network, Ltd.*, No. 3:05-CV-1367-B, 2008 WL 2885186, at *2 (N.D. Tex. July 22, 2008) (citing *Arthur Anderson & Co. v. Perry Equip., Corp.*, 945 S.W.2d 812, 818 (Tex. 1997)). Additionally, a prevailing party in Texas that does not recover damages on the underlying claim may not recover attorney's fees. *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997) (affirming denial of attorney's fees to contractor despite jury finding that subcontractor breached contract, because contractor "failed to recover damages on its breach of contract claim.").

Lastly, the Court notes that part of the disagreement over whether AT&T engaged in forum shopping is grounded in a dispute over where the Dallas Training Session and Tokyo Trip contracts were formed. While AT&T maintains that the contract concerning the Dallas Training Session was formed in Dallas in January 2013 (at the time the training session was held), CRI insists it was formed earlier, in England (and therefore afforded CRI time to prepare a presentation for the training session). AT&T Resp. 13; CRI Reply 2. With respect to the Tokyo Trip agreement, AT&T claims it has most significant ties to Dallas, whereas CRI asserts that it was formed in England. AT&T Resp. 13; CRI Mot. 10. In light of the remaining issues considered under this factor, which point to the existence of forum shopping, the outcome of this factual dispute is not determinative. In sum, the Court concludes that the third factor also weighs in favor of abstaining from deciding this declaratory action.

D.   *Possible Inequities in Proceeding in Texas*

The Court next examines whether possible inequities exist in allowing the plaintiff, AT&T, to gain precedence in time or to change forums through the filing of this declaratory action in Texas. *Sherwin-Williams Co.*, 343 F.3d at 388. This factor and the corresponding arguments raised by the

parties are closely related to the issues underlying the third factor regarding forum shopping. CRI claims that allowing AT&T's declaratory suit to go forward would be unfair, because AT&T "took advantage of CRI's diligence in complying with English civil procedures" and "showed little regard for CRI's gracious offer to resolve the dispute through alternative resolution channels so that AT&T's security measures would not be 'compromised by the litigation' of the dispute in open court." CRI Mot. 13–14. CRI adds that the cost of litigating this matter in Texas could reduce much of its expected recovery. *Id.* at 14. Finally, CRI points to the disparity of wealth between the two parties; while Crawford-Smith avers that "CRI is a small business with an average turnover of [about] £200,00 to £230,000 per annum," CRI claims that "AT&T is a multi-billion dollar global company with enormous legal and financial resources and several offices in England." *Id.*; CRI Am. App., Decl. of Crawford-Smith, App. 42. In response, AT&T asserts that CRI is also a global company, and that Crawford-Smith projects the appearance of being readily able to travel to the United States to fulfill his business responsibilities. AT&T Resp. 14–15.

As a preliminary matter, the Court reiterates the concerns raised in its discussion of the factor regarding forum shopping, as AT&T's anticipatory declaratory action allows it to gain precedence in time and change the forum in the midst of its communications with CRI regarding the parties' adherence to the English Pre-Action Protocol. In this case, this precedence in time and change in forum creates possible inequities for CRI. Turning to the parties' arguments on their respective wealth and ability to litigate disputes in a foreign court, the Court concludes that, while CRI may be a global company, its reach and financial resources are not commensurate with AT&T's. In sum, these issues suggest possible inequities that weigh in favor of staying or dismissing the present declaratory judgment action.

E.    *Convenience of the Forum for the Parties and Witnesses*

The Court next considers the fifth factor, which explores whether the federal court is a convenient forum for the parties and witnesses. *Sherwin-Williams Co.*, 343 F.3d at 388. Before delving into the parties' arguments on this issue, the Court notes that the *forum non conveniens* factors are informative in determining "whether the federal court is a convenient forum for the parties and witnesses." *Trejo*, 39 F.3d at 591. However, this factor does not require the court to examine whether the movant has satisfied a "heavy burden" in opposing a plaintiff's chosen forum, as is the case under the *forum non conveniens* analysis. *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 134 S. Ct. 568, 583 n.8 (2013) (citing *Sinochem Int'l Co. v. Malaysia Int'l Shipping Co.*, 549 U.S. 422, 430 (2007)).

The traditional *forum non conveniens* analysis is comprised of private interest factors, which relate to the convenience of the litigants, and public interest factors, which concern the convenience of the forum. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981) (citing *Gulf Oil v. Gilbert*, 330 U.S. 501, 508–09 (1947)). Private interest factors include the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* at 241 n.6 (quoting *Gilbert*, 330 U.S. at 508). Public interest factors, in turn, include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict

of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Id.* (quoting *Gilbert*, 330 U.S. at 509).

The parties' arguments as to the convenience of the forum are marked by disagreement over the location of the dealings and negotiations related to the two contracts. With respect to the private interest factors, CRI contends that England is a far more convenient forum, as is it where the parties' business relationship was centered and where the Dallas Training Session contract was formed. CRI Mot. 14–15. CRI adds that evidence of the parties' course of dealing in England is relevant in determining whether Mendonça had the authority to bind AT&T to the contracts. *Id.* Moreover, CRI insists that litigating this matter in Texas would be highly inconvenient and costly for the two primary witnesses, Mendonça, who resides in England, and Crawford-Smith, who resides in Spain but travels to England regularly to oversee CRI's business operations there. *Id.* at 15; CRI Am. App., Decl. of Mendonça, App. 38; Decl. of Crawford-Smith, App. 41.

AT&T strongly disagrees, arguing that the key witnesses and documents are in Texas. AT&T Resp. 17. In addition, AT&T maintains that, while CRI may be incorporated in England, it is based in Spain, presumably because that is where CRI's Crawford-Smith resides. *Id.* Thus, AT&T reasons that CRI's witnesses would have to travel and its evidence would have to be relocated regardless of whether the litigation proceeds in England or Texas. *Id.* at 18.

Turning to the public interest factors, CRI maintains that the action must proceed in England so as to avoid "problems of conflict of laws or the application of foreign law." CRI Mot. 16 (quoting *Syndicate 420 at Lloyd's London*, 796 F.2d at 832). CRI argues that, under the governing choice-of-law rule, "the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue." *Id.* (quoting *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414,

421 (Tex. 1984)). Because CRI contends that the contracts were formed in England, it assumes that English law would govern the underlying issues, and therefore explains that an English court would be better suited to resolve the dispute. *Id.* Next, CRI asserts that the present action should be dismissed out of respect for England's local interest in having localized controversies decided at home. *Id.* Finally, AT&T advises that it would be more prudent for this litigation to proceed in England, as English courts may decline to extend comity to a U.S. judgment exonerating AT&T. *Id.* at 15.

AT&T insists that the public interest considerations favor the Texas forum because most of the activities surrounding the Dallas Training Session and Tokyo Trip occurred in Texas. AT&T Resp. 20–21. AT&T further maintains that Texas law governs the two contracts, as Texas has the most significant relationship to the transactions at issue. *Id.* at 22–23. However, AT&T clarifies that even if this Court were required to apply English law, such a demand would not warrant the dismissal of this action. *Id.* at 22.

After reviewing the parties' arguments and their conflicting accounts of where certain critical events occurred, the Court concludes that this factor does not weigh heavily in favor of either dismissing or deciding this case. First, it appears that the key witnesses and evidence are located in Texas, England, and Spain, such that critical witnesses would suffer expense and inconvenience regardless of whether this litigation proceeds in England or Texas. Although AT&T claims that CRI's key witnesses are located in Spain and would thus face an equal burden in litigating this matter in either England or Texas, this burden would doubtless be significantly higher in defending this lawsuit in Texas. With respect to AT&T, while its former employee Mendonça resides in England, the company's remaining employees, witnesses, and evidence appear to be located in Texas. Thus,

the private interest factors appear largely neutral, although the resources available to AT&T are likely to ease its burden in the event it is required to travel and litigate this matter in a foreign court.

With respect to the public interest factors, the most disputed of which is the choice-of-law issue, the Court concludes that, because the parties disagree as to where the two contracts were negotiated and formed, any choice-of-law analysis would be based on speculation as to the location with the "most significant relationship" to the issues in this case. Without resolving this matter, the Court observes that this case could possibly entail certain "problems of conflict of laws or the application of foreign law" if it were to remain in this forum. In addition, concerns of international comity counsel towards staying or dismissing this case, as any ruling by this Court as to AT&T's liability could infringe on the province of the English court's decision.

In sum, the Court determines that the factual disputes underlying the issues considered above reduce this factor's ability to decisively tip the scales in favor of either outcome. However, considerations of the relative burdens the parties would face if forced to litigate this matter in foreign court and possible questions of choice-of-law and comity counsel toward abstaining from deciding this case.

F.    *Judicial Economy*

Next, the Court evaluates whether retaining the lawsuit would serve the purpose of judicial economy, which urges courts to "avoid duplicative or piecemeal litigation where possible." *Sherwin-Williams Co.*, 343 F.3d at 388, 391. CRI claims that retaining AT&T's lawsuit would not serve the purposes of judicial economy, because the two related suits are in the same procedural posture and the English forum can resolve all the issues in this dispute. CRI Mot. 17. AT&T, in turn, argues that a resolution can be reached more swiftly in Dallas. AT&T Resp. 24. AT&T also suggests that it is

unlikely for the identical lawsuits to proceed in two forums, because the English court may be able to stay CRI's lawsuit in favor of the first-filed suit in Dallas. *Id.*

After reviewing the parties' arguments, the Court determines that, because the present declaratory action and the English lawsuit involve the same underlying issues, any determination by this Court would either be duplicative or would fail to dispose of the issues before the foreign court. Accordingly, judicial economy would not be promoted by this Court's review of the present claim. Moreover, AT&T's suggestion that the English court may exercise its discretion to stay CRI's lawsuit cannot be addressed without considering authority on English law and procedure, which AT&T has not provided. More importantly, even if the English court could stay CRI's litigation, this Court's inquiry into judicial economy cannot hinge on speculation regarding the actions of a foreign court. The Court thus agrees with CRI that the factor concerning judicial economy weighs in favor of staying or dismissing this declaratory action.

G.    *Judicial Decree*

Finally, the Court examines the seventh factor, which inquires whether the federal court is being called on to construe a state judicial decree involving the same parties and entered by the court before whom the parallel state suit between the same parties is pending. *Sherwin-Williams Co.*, 343 F.3d at 388. The Fifth Circuit has explained that this factor implicates federalism and comity concerns. *Id.* at 392. AT&T argues that, because there is no pending parallel state suit between the parties, this factor weighs against dismissal. AT&T Resp. 24. However, the Court disagrees; because there is no state judicial decree at issue that could raise questions of federalism and comity between state and federal courts, this factor is inapplicable to the present inquiry and therefore does not weigh in favor of either deciding or dismissing this case.

H.    *Conclusion*

Ultimately, the Court concludes that the factors steer toward abstaining from deciding this declaratory action; AT&T engaged in forum shopping and filed this suit in anticipation of the related action now pending in English court. This, in turn, may result in possible inequities and does not serve the purposes of judicial economy. And while the factor regarding the convenience of the forum is riddled with factual disputes, it does weigh slightly in favor of abstaining from deciding this case. Lastly, the factor regarding the existence of a judicial decree is inapplicable to the Court's decision on CRI's Motion. On balance, the *Trejo* factors lead the Court to exercise its discretion under the Declaratory Judgment Act by abstaining from deciding this declaratory action.

The Court acknowledges AT&T's claim that England is not an available alternative forum because it does not have jurisdiction over AT&T. AT&T Resp. 16. Therefore, to address this jurisdictional concern, the Court will stay the declaratory lawsuit rather than dismiss it, with the understanding that the present action will be entertained should the English court lack jurisdiction to hear the case before it. *See Int'l Dev. Corp. v. INTP, Inc.*, No. Civ. A. 3:04-CV-854P, 2004 WL 2533560, at \*3 (N.D. Tex. Nov. 8, 2004). Accordingly, the Court **GRANTS** CRI's Motion to Stay or Dismiss and **STAYS** AT&T's declaratory action.

## IV.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant CRI Consultants Limited's Motion to Stay or Dismiss Plaintiffs' Suit. Doc. 5. The Court **STAYS** these proceedings with the understanding that the present action will be entertained should the English court lack jurisdiction to hear the case before it.

SO ORDERED.

SIGNED: August 5, 2015.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE